# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHOPPER TRADING LLC,<br><br>    Plaintiff,<br><br>v.<br><br>ALLSTON TRADING, LLC,<br><br>    Defendant. | Case No. 19-cv-1674<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Chopper Trading LLC ("Chopper" or "Plaintiff") through its undersigned attorneys for its complaint against Allston Trading LLC ("Allston" or "Defendant") hereby states as follows:

## Introduction

1.      This litigation concerns Allston's manipulation of the U.S. Treasury markets through a deceptive trading strategy called "spoofing."  Beginning in 2012, and continuing through 2015, Allston entered orders to buy or sell U.S. Treasury instruments even though it never intended to execute those orders. Allston further took steps to ensure that the orders would never be executed ("Deceptive Orders").

2.      Allston's Deceptive Orders created an artificial appearance of market demand that in turn induced other market participants to act accordingly.  For example, market makers would adjust their bid and ask prices up or down and/or post more quantity at a particular bid or ask price to follow this artificial price, believing that it represented a true reflection of market sentiment.  Non-market maker participants would trade on other bids and offers, or choose not to

1

trade, based on the belief that Allston's Deceptive Orders could be or were intended to be executed.

3.    But as the market moved in the direction of Allston's Deceptive Orders, Allston cancelled the Deceptive Orders (or used anti-self-matching technology to knock its Deceptive Orders out of the queue). At the same time, Allston placed orders in the opposite direction of its Deceptive Orders for the same Treasury instrument at the same price as the Deceptive Orders ("Aggressor Orders").  In effect, Allston's artificial prices induced the market to follow its Deceptive Orders. Allston then took advantage of that movement by cancelling the Deceptive Orders and turning around to purchase or sell those instruments at the now artificially low or high price that its Deceptive Orders induced, all to the detriment of those traders who acted based on the (false) belief that the Deceptive Orders were intended to be executed or could be executed.

4.    Allston deployed this fraudulent and deceptive spoofing scheme across the full range of Treasury instruments, including Treasury futures and 2-, 5-, 7-, and 10-year cash Treasury bonds and notes.  This strategy was repeated tens of thousands of times during numerous trading days throughout 2012-2015.  Every time it did so, Allston was able to manipulate the Treasury markets to the detriment of Plaintiff and other market participants.

5.    This conduct was intended and designed to harm competitors and drive them out of business.  It worked, because Chopper was forced to sell its trading assets for significantly less than it otherwise would have received but for Allston's spoofing.  Further, had Chopper not been forced to sell and able to continue its trading operations unimpeded by Allston's spoofing, it would have earned substantial profits from 2015 to the present based on the time periods when Allston was not spoofing.

**Jurisdiction and Venue**

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5.

7. Venue is proper in this District because the acts giving rise to the complaint occurred in Chicago, Illinois, and Plaintiff was harmed in Chicago, Illinois.

**Parties**

8. Plaintiff Chopper Trading LLC is a Delaware limited liability corporation with its principal place of operations located at 191 North Wacker Drive, Suite 1125, Chicago, IL 60606. In January 2015, Chopper Trading sold the majority of its assets to DRW Holdings, LLC. As part of the sale, Chopper retained all claims based on spoofing against any market participant.

9. Plaintiff Chopper Trading LLC was, in effect, a market maker for U.S. Treasury instruments. Chopper offered bids and asks at the same time for the same Treasury instrument, with the difference between the bid and ask referred to as the "bid-ask spread." In this role, Chopper did not hold Treasury instruments to maturity; instead it typically closed or hedged positions within seconds, minutes, or hours, or days, with fills being hedged immediately. Chopper traded cash Treasury instruments on electronic platforms such as BrokerTec and eSpeed. Chopper brings this lawsuit based on the following U.S. Treasury instruments: (1) notes with maturities of 2, 3, 5, 7, and 10 years; and (2) 30-year Treasury bonds.[1] Each of these instruments is a security under the Exchange Act.

---

[1] Chopper does not assert, in this complaint, damages against Allston for violations of the Commodity Exchange Act based on spoofing behavior in the market for Treasury futures. Simultaneous to the filing of this complaint, Chopper has initiated an arbitration demand for damages from Allston arising from violations of the CEA in exchanges for treasury futures operated by CBOT. This complaint asserts claims for separate damages arising from securities fraud in the cash treasury exchanges operated by BrokerTec and eSpeed.

10.     Defendant Allston Trading LLC is an Illinois limited liability corporation with its headquarters and principal place of business at One Financial Place, 440 S. LaSalle Street, Chicago, Illinois 60605.  Allston traded most types of Treasury instruments, including Treasury futures, across multiple platforms including, but not limited to, BrokerTec and eSpeed.

## Factual Allegations

### A. BrokerTec and eSpeed Treasury Platforms

11.     Both BrokerTec and eSpeed offer electronic trading platforms in the secondary market for U.S. Treasury instruments.  These platforms permit participants to electronically trade 2-, 3-, 5-, 7-, and 10-year Treasury notes and 30-year Treasury bonds.  BrokerTec and eSpeed display "order books" to market participants that show the best (highest) bid and best (lowest) ask prices for a particular Treasury instrument at that moment in time.  The best available bid price is referred to as the "top of the book bid."  The best available ask price is referred to as the "top of the book offer."

12.     In addition, the order books display the total available order volume to all market participants.  When multiple bids or asks are pending at the same price, the platforms assign priority to those orders based on which orders were entered first, otherwise known as "first in, first out" priority wherein the oldest order entered is matched first.  When two orders are matched, the trade is executed.

13.     A typical order book display is as follows:



14.     Trading on these platforms is anonymous, and the identity of any trader behind a specific bid or ask is confidential and known only to BrokerTec and eSpeed.

**B. Spoofing**

15.     Spoofing refers to a form of manipulative conduct whereby one artificially affects the price of a security by sending false pricing signals into the market and/or deceiving market participants about the supply and demand of financial instruments.  The United States Securities and Exchange Commission prosecutes spoofing as a violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The SEC describes a form of spoofing that matches Allston's trading behavior at issue in this case (with some slight deviations).  For example:

> In a spoofing scheme, a trader places non-bona fide orders – spoofs – that the trader does not intend to have executed, on one side of the market.  The non-bona fide buy or sell orders create a false appearance of buy or sell interest in the security, which often results in a price change.  The trader who placed the non-bona fide orders then places bona fide orders on the opposite side of the market for the same [security], in an attempt to take advantage of any price change resulting from the false appearance of buy or sell interest.  Immediately after the bona fide orders are executed, the trader cancels the open, non-bona fide order.

5

*Briargate Trading, LLC, et al.*, Securities Act Release No. 9959, Securities Exchange Act Release No. 76104 (SEC Oct. 8, 2015). In SEC Litigation Release No. 18894 (Sept. 23, 2004), the SEC defines spoofing as involving "an order placed by a market participant with the intention of briefly triggering a market movement from which the participant or others may benefit by trading the opposite side of the original manipulative order."

16.     A trader can engage in spoofing even though it uses legitimate means to place orders into and withdraw them from an order book. Instead, the determinative factor is the trader's intent: "Simply because an activity was legal does not mean it was not illegally manipulated. Manipulation can be illegal solely because of the actor's purpose." *Markowski v. S.E.C.*, 274 F.3d 525, 529 (D.C. Cir. 2001). Thus, even though placing and withdrawing orders through BrokerTec and eSpeed can be legitimate trading activity, it becomes spoofing when the trader placed those orders without the intent to execute them and with the intent to artificially manipulate the market.

17.     Spoofing is harmful to all market participants (other than the entity doing the spoofing) because it disrupts the normal functioning of the electronic cash and futures treasury markets, which many small retail investors, pension funds, and corporations use to protect their investments. Entities like Chopper that continuously stream bids and asks for treasury markets are an integral component of a properly functioning electronic treasury market, and spoofing decreases the amount of liquidity available to investors while also impacting its bottom line. When entities like Chopper cannot provide liquidity to the market and are incurring losses because of a lack of trade integrity, the entire market is placed in jeopardy.

### C. Allston's Spoofing Strategy

18.     Allston manipulated the U.S. Treasury markets by submitting and then withdrawing the Deceptive Orders. The Deceptive Orders created the false appearance of

demand to either buy or sell certain Treasury Instruments. As a result, the Deceptive Orders induced other market participants to enter sell orders below, or buy orders above, what would otherwise have been the prevailing market price and quantity. In addition, other market participants maintained positions below or above what would otherwise have been the prevailing market price and quantity (perhaps by adding additional quantities to a preexisting bid or ask). Market participants made these trading decisions based on what appeared to be a legitimate change in supply or demand. The Deceptive Orders harmed market maker participants that were induced into changing or not changing their preexisting bid or ask prices or amounts based on the false appearance of demand, as well as non-market maker participants that bought or sold, or chose not to buy or sell, certain quantities based on the false appearance of supply or demand.

19.    After entering the Deceptive Orders and inducing others to modify their trading behavior, Allston then "flashed" the market by cancelling its Deceptive Orders while simultaneously entering Aggressor Orders for the same instrument on the opposite side of the Deceptive Order.[2] These Aggressor Orders matched with the bid or ask prices that were generated because of the now-withdrawn Deceptive Orders. This allowed Allston to buy or sell Treasury Instruments from other market participants at artificially high or low prices that were induced by its own Deceptive Orders.

20.    Allston's spoofing had several repeated, defining characteristics demonstrating that its sole intent in placing the Deceptive Orders was to manipulate the market:

---

[2] On treasury futures platforms, Allston used anti-self-matching technology that enabled it to spoof without needing to cancel the Deceptive Orders. When in place, the anti-self-matching technology operated such that if the Aggressor Orders matched the Deceptive Orders, both would be knocked out of the queue. As a result, on other platforms Allston no longer needed to cancel the Deceptive Orders; rather, it would just place more Aggressor Orders than desired. Some of the Aggressor Orders would automatically cancel its Deceptive Orders, while the remaining Aggressor Orders would successfully trade, matching against the bids and asks placed by other market participants in reaction to Allston's Deceptive Orders.

21.     *First*, the Deceptive Orders (conservatively calculated) represented, on average, more than 37% of the size of the posted bid at the best available price. Their average total size was more than 58 times the amount of the average size of any single order in the order book.  As discussed further below, the size of the Deceptive Orders ensured that they would have a large impact on the entire market.

22.     It is highly unusual in cash treasury markets for a trader to place such large orders relative to the current size of the order book, especially large orders subsequently cancelled over and over again.  Instead, Allston could have entered its large orders as partially visible "iceberg" orders that would not create such a strong market reaction.  If Allston truly intended to execute such a large quantity of its Deceptive Orders, it would have placed them as iceberg orders so as not to prompt significant market reactions.  But by entering orders that were relatively large and visible compared to the size of the preexisting order book, Allston ensured its Deceptive Orders would induce a strong market reaction.

23.     *Second*, the Deceptive Orders were often placed at the same price as the best bid or offer price.  Because of the first in, first out method of matching and execution, this consistent pattern ensured that the Deceptive Orders would have a strong impact on the market while still making it highly unlikely that those orders would be executed.

24.     *Third*, these large Deceptive Orders were typically cancelled within milliseconds of Allston entering its Aggressor Orders, and often at the exact same time.

25.     *Fourth*, the Deceptive Orders were entered and cancelled along with the appearance of subsequent Aggressor Orders across multiple different Treasury instruments and in multiple markets all at once, including the U.S. Treasury futures markets operated by the Chicago Board of Trade.

26.     *Fifth*, whenever Chopper hit the Deceptive Orders, the remaining Deceptive Orders would be immediately cancelled, which indicates that Allston did not want any meaningful quantities of the Deceptive Orders to be executed.

27.     *Sixth*, the Aggressor Orders were often the exact size needed to take all available liquidity remaining after the cancelled Deceptive Orders, which means that the trader making the Aggressor Orders knew that the Deceptive Orders would be cancelled and knew the exact amount of liquidity that would remain thereafter.  The repeated, highly coordinated nature of the cancelling of the Deceptive Orders and the size of the Aggressor Orders so as to sweep the entire remaining book at the artificially induced price evidences that the same trader was behind both orders as part of a pre-planned spoofing strategy.  It is highly unlikely that a single trader would change his or her mind within milliseconds in such a coordinated manner with respect to sweeping most or all the remaining book across multiple platforms and instruments, day after day.

28.     Because trading on BrokerTec and eSpeed is anonymous, Chopper was unaware of the identity of the trading firm behind these patterns at the time.  Plaintiff discovered in 2018 through conversations with market participants that Allston was the entity placing the Deceptive and Aggressor Orders.  Plaintiff discovered that Allston used an algorithm to accomplish its spoofing strategy, which means that the Deceptive Orders were preprogrammed to be cancelled once certain conditions were met.  The algorithm was developed by Mike Cordaro and Mihai Lehene, both of whom were in charge of the relevant trading group at Allston.

**D.  The Deceptive Orders Affected the Market**

29.     The Deceptive Orders were intended to be, and operated as, false pricing signals that interfered with the natural functioning of the markets.  In effect, the Deceptive Orders were the bait that induced other market participants to follow suit based on their belief that those

orders represented legitimate demand, but which in reality created a trap that enabled Allston to trade at artificially low or high prices and quantities.

30.     An oft-used measure of the strength of the market is the weighted average ratio ("WAR") between the bid and the offer.  WAR is the ratio of the size of the bids relative to the sum of the size of the bids and offers [Bid Size/(Bid Size + Offer Size)].  The closer to zero the WAR is, the weaker the bid and the stronger the offer.  The closer to 1 the WAR is, the stronger the offer and the weaker the bid.  Traders use WAR as a signal of the value of a given security at a point in time.

31.     A balanced market with equal quantities of orders for both the bids and the offers would have a WAR of 0.5, which means the theoretical market price is halfway between the bid and offer.  For example:



32.     When a trader places additional offers, the WAR decreases respectively, meaning the theoretical price of that security is now closer to the bid.  Using the example above, if the offer size becomes $100 million instead of $50 million, then the WAR shifts to 0.33.  As a result, traders would believe the theoretical value of that security is now closer to the bid price rather than halfway between the bid and offer price.



33.     Thus, simply by placing orders on one side, Allston sent false pricing signals that led other traders to believe the theoretical value of that Treasury instrument had moved to one side or the other (depending on the side of Allston's Deceptive Orders).  In effect, additional Deceptive Orders, even if placed at a price previously set by someone else, influence theoretical value and, thus, actual trading. The larger the quantity of the Deceptive Orders, the greater the impact on the security's theoretical value even if the Deceptive Orders were never executed.

34.     Allston's use of such large orders to shift the WAR of a security, while those large orders sat shielded behind other, much smaller orders, reflects its intent to skew market perception of value while simultaneously making it very unlikely that its Deceptive Orders would be executed.

**E.  March 4, 2014**

35.     March 4, 2014 provides an illustration of Allston's typical manner of spoofing the Treasury markets.  Allston made the following cancellations of Deceptive Orders and crossing Aggressor Orders on multiple Treasury instruments, across multiple platforms, all within less than 27 milliseconds of 9:55:05.081 a.m. CDT:

(a)  10-year Treasury Notes on BrokerTec: The BrokerTec 10-year Treasury order book had a bid of 100-25.5 for $164 million.  Simultaneously, a trader now known to be Allston cancelled bids on BrokerTec representing a size of $58 million (35% of the bid size) leaving only $106

11

million remaining. Also simultaneously, a trader now known to be Allston entered Aggressor Orders on BrokerTec for all of the remaining $106 million bids of 10-year Treasury notes.

(b) 7-year Treasury Notes on BrokerTec: The BrokerTec 7-year Treasury order book had a bid of 99-4.5 for $158 million. A trader now known to be Allston cancelled orders on BrokerTec representing a size of $49 million (31% of the bid size) leaving $109 million remaining. Also nearly simultaneously, a trader now known to be Allston entered Aggressor Orders on BrokerTec for all of the remaining $109 million bids of 7-year treasury notes.

(c) 5-year Treasury Notes on BrokerTec: The BrokerTec 5-year Treasury order book had a bid of 99-30.75 for $147 million in 5-year Treasury notes. A trader now known to be Allston cancelled orders on BrokerTec representing a size of $69 million (47% of the bid size) leaving $78 million remaining. Also nearly simultaneously, a trader now known to be Allston entered Aggressor Orders on BrokerTec for all of the remaining $78 million bids.

(d) 10-year Treasury Note Futures: At the exact same time as this concerted cancellation of Deceptive Orders and entering of Aggressor Orders in the cash Treasury markets, a trader now known to be Allston enacted the same strategy in the futures markets offered on the Chicago Board of Trade. At that time, the 10-year Treasury Note Futures order book had a bid of 124-17.5 with a size of 2530 contracts. A trader now known to be Allston cancelled 1,351 of those bids (53% of the total bid size), leaving 1179 contracts. Simultaneously, a trader now known to be Allston entered Aggressor Orders for all of those 1179 contracts.

(e) 30-year Treasury Bond Futures: At the same time, the 30-year Treasury Bond Futures order book had a bid of 132.30 with a size of 1037 contracts. A trader now known to be Allston cancelled 493 of those contracts (47% of the total bid size), leaving 544 contracts.

Simultaneously, a trader now known to be Allston entered crossing Aggressor Orders for all of the 544 contracts remaining.

(f) <u>5-year Treasury Note Futures</u>:  Also at the same time, the 5-year Treasury Note Futures order book had a bid of 119-27.75 with a size of 1272 contracts.  A trader now known to be Allston cancelled 638 of those contracts (50% of the total bid size), leaving 604 contracts. Simultaneously, a trader now known to be Allston entered crossing Aggressor Orders for exactly 604 contracts.

36.     This activity occurred in less than 27 milliseconds.  The coordination of the Deceptive Orders, their size relative to the rest of the order book, and their cancellation with the crossing Aggressor Orders in multiple cash Treasury markets and Treasury futures markets demonstrates that Allston never intended to execute its Deceptive Orders in the first place. The Deceptive Orders' cancellation and the simultaneous crossing Aggressor Orders in almost the exact amounts of the remaining offer size were part of a concerted and premeditated spoofing strategy.

**F.  Allston's Spoofing Damaged Chopper**

37.     Allston's trading induced Plaintiff into modifying its trading behavior to its own detriment once those Deceptive Orders were cancelled and the crossing Aggressor orders were entered. Whenever Chopper's orders were hit by either Allston's Aggressor Orders (or were hit by another participant following Allston's strategy), Chopper's trading algorithms would in almost all circumstances immediately implement strategies to hedge and cover that order promptly to lock in or hedge Chopper's losses.

38.     Because of the highly correlated nature of treasury notes, bonds, and futures, and the very liquid, tight market for those products, Chopper could and would often hedge trades in one treasury instrument with offsetting trades in different treasury instruments that are highly

correlated. Because Chopper's hedging and covering of trades was preprogramed and operated within milliseconds, Chopper can easily identify hedges that it made to its detriment across multiple treasury markets as a result of Allston's spoofing of the cash treasury markets on BrokerTec and eSpeed.

39. Attached as Exhibit 1 is an Excel spreadsheet identifying the instances and details surrounding Allston's spoofing. It shows the time when the Allston cancelled its spoofed orders and simultaneously swept the remaining book, the instrument(s) in which the spoofing occurred, whether it was on the bid or ask side, and the price of the instrument when it occurred. It also shows for each event the size of the cancellation relative to the preexisting size of the order book, as well as the percentage of the book remaining that was swept by Allston. It also estimates the total loss suffered by Chopper as a result of Allston's spoofing.[3]

40. For example, in event ID 3, on June 4, 2014 at 12:18:46.430, Allston cancelled 1027 contracts of bids for 10-year futures at the price 134.453125. This cancellation equaled 47.79% of the preexisting order book size, and in the aggregate the cancellation was more than 100 times the average non-Allston order size. At the same time, Allston entered orders to take exactly 100% of the 1096 contracts that remained. As a result of Chopper trading with Allston, it had to hedge that trade at a loss of $703.12. Similar activity occurred in nearly every other cash and future treasury instrument at almost the same time.

41. Plaintiff was not able to learn the specific identity of the traders behind these trades and their intent, e.g., that it was done using pre-programmed algorithms, until 2018 because the data is otherwise anonymous.

---

[3] Chopper continues to process new data, so these numbers are preliminary and subject to further supplementation.

42.     Provided below are just a few of more than tens of thousands of trades detailed in Exhibit 1 that resulted in losses to Chopper as a result of Allston's spoofing.  For each one of these examples, Allston's spoofing caused it to trade with Chopper at artificial prices and/or caused Chopper to trade with other participants at artificial prices. This in turn caused Chopper to hedge its losses by purchasing the opposite side of the same instrument at a worse price, or by purchasing highly correlated different instruments at a price worse than existed prior to Allston's spoofing.

a.  On October 1, 2014 at 15:54:41.732, Allston cancelled its preexisting Deceptive Orders on multiple platforms, which at that time averaged between approximately 25-50% of the preexisting order book size for any given product. At the exact same time, Allston swept the entire remaining book on each and every product that it cancelled. As a consequence, Chopper bought $2M in notional value of 5-year treasury notes from Allston at the artificial price of 100-10.50 and $9M in notional value of 5-year treasury bonds from Allston at the artificial price of 100-10.25.  Within 33 milliseconds, Chopper began hedging this trade by selling $11M in notional value of 5-year treasury bonds at the price of 100-9.75, with a total loss of $1,874.73.  At the same time, Chopper bought $12M in notional value of 7-year treasury notes from Allston at the artificial price of 100-.00 and within 33 milliseconds began hedging this trade by selling $12M in notional value at the price of 99-31.50, with a total loss of $1,875.00.  Also at the same time, Chopper bought $10M in notional value of 10-year treasury notes from Allston at the artificial price of 99-20.50, and within 33 milliseconds Chopper began hedging this trade by selling $10M in notional value of 10-year treasury notes at the price of 99-20.00, with a total loss of $1562.50. Accounting for all of Allston's Deceptive and Aggressive Orders across all treasury products that Chopper ended up trading with at this time and the cash treasury trades Chopper automatically made to hedge Allston's trades relative to the prices of those cash products prior to Allston's spoof, Chopper suffered a total loss of $12,500.06.

b.  On August 27, 2014 at 16:38:05.022, Allston cancelled its preexisting Deceptive Orders on multiple platforms, which at that time averaged between approximately 23 and 46% of the preexisting order book size for any given product. At the exact same time, Allston swept the entire book that remained for each and every product that it cancelled. As a consequence, Chopper sold $1M in notional value of 30-year treasury bonds at the artificial price of 100-1.00, and within an average of 46 milliseconds Chopper hedged that trade by buying $1M in notional value of 30-year treasury bonds at the price of 100-2.5 with a loss of $468.75. Chopper sold $7M in notional value of 10-year treasury notes at the artificial price of 100-3.50 and within an average of 46 milliseconds hedged that trade by buying $7M in notional value of 10-year notes at the price of 100-4 with a loss of $1,093.75. Accounting for all of Allston's Deceptive

and Aggressive Orders across all treasury products that Chopper ended up trading with at this time and the cash treasury trades Chopper automatically made to hedge because of this spoofing relative to the prices of those cash products prior to Allston's spoof, Chopper suffered a total loss of $4,374.89.

c.  On July 31, 2014 at 19:10:24.333, Allston cancelled its preexisting Deceptive Orders on multiple platforms, which at that time averaged between approximately 14 and 52% of the preexisting order book size for any given product. At the exact same time, Allston swept the entire book that remained for each and every product that it cancelled. As a consequence, Chopper sold $4M in notional value of 30-year treasury bonds at the artificial price of 101-0.50 and $2M at the artificial price of 101-1.00 and within 50 milliseconds began hedging that trade by buying $2M in notional value of 30-year treasury bonds at the price of 101-1.00 and $2M in notional value of 30-year treasury bonds at the price of 101-1.50, with a loss of $312.50.

d.  On June 4, 2014 at 18:45:02.997, Allston cancelled its preexisting Deceptive Orders on multiple platforms, which at that time averaged between approximately 20 and 68% of the preexisting order book size for any given product. At the exact same time, Allston swept the entire book that remained for each and every product that it cancelled. As a consequence, Chopper sold $3M in notional value of 5-year treasury notes to Chopper at the artificial price of 99-10.00 and within 31 milliseconds began hedging that trade by buying $1M in notional value of 5-year treasury bonds at the price of 99-10.50 and $2M at 99-10.25, with a total loss of $312.50. Chopper sold $2M in notional value of 10-year treasury notes to Allston at the artificial price of 99-2.00 and within 31 milliseconds began hedging that trade by buying $2M in notional value of 10-year treasury notes at the price of 99-2.50, with a loss of $312.50. Chopper also at this same time sold $5M in notional value of 30-year treasury bonds at the artificial price of 98-21.00 and $5M at 98-21.5 and within 31 milliseconds began hedging that trade by buying $1M in notional value of 30-year treasury bonds at the price of 98-21.50, with a total loss of $156.25. Accounting for all of Allston's Deceptive and Aggressive Orders across all treasury products that Chopper traded with at this time and the cash treasury trades Chopper made to hedge those trades relative to the prices of those cash products prior to Allston's spoof, Chopper suffered a total loss of $4,765.57.

e.  On May 6, 2014 at 13:36:49.388, Allston cancelled its preexisting Deceptive Orders on multiple platforms, which at that time averaged approximately 19-45% of the preexisting order book size for any given product. At the exact same time, Allston swept the entire book that remained for each and every product that it cancelled. As a consequence, Chopper sold $3M in notional value of 10-year treasury notes to Allston at the artificial price of 101-7.00. Chopper hedged this trade by buying $2M in notional value of 10-year treasury notes at the price of 101-8.00 for a loss of $625.00. At the same time, Chopper sold $3M in notional value of 5-year treasury notes to Allston at the artificial price of 99-22.75. Chopper hedged this trade by buying $1M in notional value of 5-year treasury notes at the price of 99-23.25 for a loss of $156.25. Accounting for all of Allston's Deceptive and Aggressive Orders

across all treasury products that Chopper traded with and the cash treasury trades Chopper automatically made to hedge these Allston trades relative to the prices of those cash products prior to Allston's spoof, Chopper suffered a total loss of $781.25.

f. On March 4, 2014 at 14:55:05.081, Allston cancelled its preexisting Deceptive Orders on multiple platforms, which at that time averaged between approximately 31-51% of the preexisting order book size for any given product. At the exact same time, Allston swept the entire book that remained for each and every product that it cancelled. As a consequence, Chopper bought $3M in notional value of 5-year treasury notes from Allston at the artificial price of 99-30.75 and within 40 milliseconds began hedging that trade by selling $3M in notional value of 5-year treasury notes for 99-30.5, with a loss of $234.38. At the same time, Chopper bought $4M in notional value of 7-year treasury notes from Allston at the artificial price of 99-4.50 and within 40 milliseconds began hedging that trade by selling $4M in notional value of 7-year treasury notes at the price of 99-4.0, with a loss of $625.00. Also at the same time, Chopper bought $4M in notional value of 10-year treasury notes from Allston and within 40 milliseconds began hedging that trade by selling $4M in notional value of 10-year treasury notes at the price of 100-25, with a total loss of $625.00. Accounting for all of Allston's Deceptive and Aggressive Orders across all treasury products that Chopper traded with at this time and the cash treasury trades Chopper automatically made to hedge these Allston trades relative to the prices of those cash products prior to Allston's spoof, Chopper suffered a total loss of $3,124.97.

g. On February 28, 2014 at 13:23:41.239, Allston cancelled its preexisting Deceptive Orders on multiple platforms, which at that time averaged between approximately 26 and 55% of the preexisting order book size for any given product. At the exact same time, Allston swept the entire book that remained for each and every product that it cancelled. As a consequence, Chopper bought $16M in notional value of 10-year treasury notes from Allston at the artificial price of 100-25.00. Chopper hedged this by selling $1M 10-year treasury notes at 100-23.50 and $1M 10-year treasury notes at 100-24.50 for a loss of $625.00. Also at the same time, Chopper bought $10M 7-year treasury notes at 99-5.50. Chopper hedged by selling $2M 7-year notes at 99-5 for a loss of $312.50. Also at the same time, Chopper bought $3M 5-year treasury notes at 99-31.00. Chopper hedged this position by selling $3M 5-year treasury notes at 99-30.25 for a loss of $703.13. Accounting for all of Allston's Deceptive and Aggressive Orders that Chopper traded with at artificial prices at this time and the cash treasury trades Chopper automatically made to hedge these Allston trades relative to the prices of those cash products prior to Allston's spoof, Chopper suffered a total loss of $1,640.64.

h. On February 21, 2014 at 9:08:38.233, Allston cancelled its preexisting Deceptive Orders on multiple platforms, which at the time averaged between approximately 34 and 58% of the preexisting order book size for any given product. At the exact same time, Allston swept the entire book that remained for each and every product that it cancelled. As a consequence, Chopper bought $5M in notional value of 10-year treasury notes from Allston at the artificial price of 100-0.50 and within 28

milliseconds began hedging that Allston trade, eventually selling $3M in notional value of 10-year treasury bonds at the price of 100-0.00, with a loss of $468.75. Also at the same time, Chopper bought $14M in notional value of 5-year treasury notes at the artificial price of 99-26.75. Chopper sold $1M in notional value of 5-year treasury notes at 99-26.25 for a loss of $156.25.

i.  On November 13, 2013 13:04:16.625, Allston cancelled its preexisting Deceptive Orders on multiple platforms, which at that time averaged between approximately 14 and 67% of the preexisting order book size for any given product. At the exact same time, Allston swept the entire book that remained for each and every product that it cancelled. As a consequence, Chopper sold $4M in notional value of 5-year treasury notes to Allston at the artificial price of 99-5.25 and within 70 milliseconds began hedging that trade by buying $4M in notional value of 5-year treasury notes at the price of 99-5.50, with a loss of $312.50.  At the same time, Chopper sold $5M in notional value of 7-year treasury notes to Allston at the artificial price of 97-19.50 and within 70 milliseconds began hedging that trade by buying $5M in notional value of 7-year treasury notes at the price of 97-20.00, with a loss of $781.25.  Also at the same time, Chopper sold $4M in notional value of 10-year treasury notes to Allston at the artificial price of 97-29.00 and within 70 milliseconds began hedging that trade by buying $2M at the price of 97-29.50 and another $2M at the price of 97-30.50, with a total loss of $1,250.  Also at the same time, Chopper sold $2M in notional value of 30-year treasury notes at the artificial price of 96-8.50 and within 70 milliseconds began hedging that trade by buying $1M at the price of 96-9.50 and another $1M at the price of 96-11.50, with a total loss of $1,562.50.  Accounting for all of Allston's Deceptive and Aggressive Orders across all treasury products that traded with Chopper at this time, and the cash treasury trades automatically made by Chopper to hedge these Allston trades relative to the prices of those cash products prior to Allston's spoof, Chopper suffered a total loss of $3,593.75.

j.  On September 23, 2013 at 17:10:16.230, Allston cancelled its preexisting Deceptive Orders on multiple platforms, which at that time averaged between approximately 27 and 47% of the preexisting order book size for any given product. At the exact same time, Allston swept the entire book that remained for each and every product that it cancelled. As a consequence, Chopper sold $12M in notional value of 10-year treasury notes to Allston at the artificial price of 98-5.00 and within 3 milliseconds began hedging that trade, eventually buying $1M in notional value at the price of 98-6.00, with a loss of $312.50.  At the same time, Chopper sold $2M in notional value of 5-year treasury notes to Allston at the artificial price of 100-6.25 and within 3 milliseconds began hedging that trade, eventually buying $2M in notional value at the price of 100-7.00, with a loss of $468.75.  Accounting for all of Allston's Deceptive and Aggressive Orders across all treasury products that Chopper traded with at this time and the cash treasury trades Chopper automatically made to hedge these Allston trades relative to the prices of those cash products prior to Allston's spoof, Chopper suffered a total loss of $1,015.64.

18

43.     Allston's spoofing caused millions of dollars in trading losses for Chopper. It also ultimately placed Chopper in a position whereby it had to sell its trading assets to DRW Holding, LLC for significantly less than they otherwise would have been worth.

44.     It was reasonably foreseeable by Allston that its spoofing would drive other market maker participants, including Chopper, to go out of business and/or to take a lower purchase price on their assets than would have occurred but for Allston's spoofing.  The detrimental effect on competitors is self-evident when one tricks them into trading at artificial prices hundreds of times a day across multiple platforms over a period of more than two years.

### COUNT I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

45.     Plaintiff restates and incorporates herein the above allegations.

46.     Allston, directly or indirectly, individually or in concert with others, used the means or instrumentalities of interstate commerce to employ devices, schemes, or artifices to defraud and to engage in acts, practices or courses of business which operated or would operate as a fraud or deceit upon others in connection with the sale of a security.

47.     Specifically, Allston placed orders on BrokerTec and eSpeed that it never intended to execute for the purpose of defrauding market participants. These orders induced market participants to react based on the false appearance of demand or supply. Market participants' reactions led to sales of securities when defrauded participants matched and executed with Allston's Aggressor Orders on the other side of the book, including Chopper.

48.     Plaintiff relied on the integrity of each bid or ask in the order book for each of the Treasury instruments orders it placed and the for each of the instruments it purchased or sold (or chose not to purchase or sell).  Unbeknownst to Plaintiff, Allston never intended to trade its Deceptive Orders.

49. As a result of the aforementioned, Chopper has been damaged.

50. As a result of the aforementioned, Allston has violated Section 10(b) of the Exchange Act and Rule 10b-5.

## COUNT II
## Illinois Consumer Fraud Act

51. Plaintiff restates and incorporates herein the above allegations.

52. Allston engaged in a deceptive or unfair practice under the Illinois Consumer Fraud Act, 815 ILCS 505/1, et seq., by advertising goods with the intent not to sell them as advertised, as prohibited in the Illinois Deceptive Trade Practices Act, 815 ILCS 510/1, et seq.

53. Allston intended all market participants, including Chopper, to act or modify their own trading behavior based on the Deceptive Orders that it never intended to execute.

54. There were entities on BrokerTec and eSpeed that purchased treasury instruments and held them to maturity.

55. Allston's spoofing caused the entire market of consumers purchasing or selling cash treasuries electronically at the time of its spoofing to do so at artificial prices.

56. Chopper was actually deceived by the Deceptive Orders in that it entered into trades with Allston and others in the course of trade and commerce that it would have never entered into absent the Deceptive Orders and subsequent crossing Aggressor Orders.

57. Allston's conduct occurred in the course of conduct involving trade and commerce, primarily the trade of treasury securities on electronic platforms.

58. Allston's conduct damaged Chopper because it entered into losing trades as a result of Allston's spoofing and was prevented from executing other profitable trades because of the liquidity taken up by Allston's spoofing and the hedging and covering activity needed to minimize its losses caused by Allston's spoofing.

Case: 1:19-cv-01674 Document #: 1 Filed: 03/09/19 Page 21 of 22 PageID #:21

59.     It was reasonably foreseeable to Allston that entities such as Chopper would suffer trading losses as a result of its spoofing strategy.

60.     As a result of the losing trades and the opportunity costs imposed on Chopper to cover and hedge those trades, Chopper had to sell its assets to DRW for significantly less than it would have otherwise obtained. Alternatively, had it not been forced to sell its trading operations, Chopper would have earned substantial profits between January 2015 and the present based on market developments since then and its prior trading profits when unimpeded by Allston's spoofing.

61.     It was reasonably foreseeable to Allston that entities such as Chopper would be driven out of business or forced to accept less in a sale as a result of coordinated spoofing across multiple platforms and numerous different instruments hundreds of times a day, with each instance resulting in profit to it and losses to others by trading at an artificial price.

**PRAYER FOR RELIEF**

62.     Plaintiff requests relief as follows:

A.     That the Court enter an order declaring that Defendant's actions, as set forth in this Complaint, violate the law;

B.     That the Court award Plaintiff damages, punitive damages, and/or restitution in an amount to be determined at trial;

C.     That the Court issue appropriate injunctive and other equitable relief against Defendant;

D.     That the Court award Plaintiff pre- and post-judgment interest;

E.     That the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses; and

F.     That the Court award any and all such other relief as the Court may deem just and proper.


Dated:   March 9, 2019                     /s George A. Zelcs
                                           George A. Zelcs
                                           Randall P. Ewing, Jr.
                                           Chad E. Bell
                                           KOREIN TILLERY LLC
                                           205 North Michigan Plaza, Suite 1950
                                           Chicago, IL 60601
                                           Phone: (312) 641-9750
                                           Fax: (312) 641-9751
                                           *Attorneys for Plaintiff Chopper Trading, LLC*