UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHOPPER TRADING LLC,<br><br>Plaintiff,<br><br>v.<br><br>ALLSTON TRADING LLC,<br><br>Defendant. | Case No. 19-cv-01674<br><br>Judge Martha M. Pacold |

## MEMORANDUM OPINION AND ORDER

Chopper Trading LLC filed an amended complaint against Allston Trading LLC, alleging that that Allston manipulated the U.S. Treasury markets through a trading strategy known as spoofing. [27]. Chopper alleges that, through spoofing, Allston created illusory appearances of supply and demand, caused Allston's competitors, including Chopper, to trade at artificially low or high prices or quantities, enabled Allston to execute trades advantageous to itself, and ultimately drove Chopper out of business.

Allston moves to compel arbitration, [32], dismiss the amended complaint, [41], and supplement the record, [74] (sealed), [75].

For the following reasons, the court grants the motion to compel and motion to supplement. The arbitrability of Chopper's claims is itself a question for arbitration. This case is stayed pending resolution of the arbitration. If the arbitrator decides that Chopper's claims are not arbitrable and Allston seeks to reopen this case, the court will do so. Allston's motion to dismiss is denied without prejudice, with leave to refile should the arbitrator decide that Chopper's claims are not arbitrable.

## BACKGROUND

### I. The Parties' Disputes

During the relevant time period (2012 through 2015), Chopper and Allston both traded in two markets: the market for U.S. Treasuries (Treasury notes and bonds), or the "cash Treasury market"—and the market for Treasury futures contracts.

As to the cash Treasury market: Chopper and Allston traded in this market on the electronic trading platforms BrokerTec and eSpeed. Chopper initiated the present lawsuit by filing a complaint in this court asserting a Securities and Exchange Act claim (and a state law claim) concerning this market.

As to the market for Treasury futures contracts: Chopper and Allston traded in this market through exchanges operated by the Chicago Board of Trade (CBOT). Both Chopper and Allston were members of CBOT during the relevant time period. The CBOT Rules subject disputes between members to mandatory CBOT arbitration[1] under circumstances defined in the CBOT Rules. Chopper filed in CBOT arbitration a demand asserting violations of the Commodity Exchange Act concerning this market.

Chopper alleges that Allston engaged in "spoofing" in both markets. The alleged spoofing, according to Chopper's allegations, involved issuing deceptive orders that Allston never intended to execute and that Allston would withdraw before they were executed, but that nevertheless created an artificial appearance of supply or demand and moved the market. Chopper alleges that the spoofing caused Allston's competitors, including Chopper, to trade at artificially low or high prices or quantities while enabling Allston to execute trades advantageous to itself, ultimately driving Chopper out of business.

The parties agree that the claims regarding Treasury futures (involving trades on CBOT exchanges, under the Commodity Exchange Act) belong in arbitration before the CBOT. As noted above, Chopper initiated a CBOT arbitration on the futures claims.

The parties dispute (1) whether Allston engaged in spoofing; (2) whether the spoofing claims regarding the Treasuries market (involving trades on BrokerTec and eSpeed, under the Securities and Exchange Act) belong (a) in court or (b) in CBOT arbitration along with the spoofing claims regarding Treasury futures; and (3) who should decide the second question, an arbitrator or this court.

## II.  Procedural History

The procedural history provides important context for the parties' disputes. Thus, the court describes the history in some detail.

Chopper filed its original complaint (no longer the operative complaint) on March 3, 2019. [1]. Chopper's original complaint alleged improper trading activity

---

[1] Specifically, the mandatory arbitration is before a CME Group Arbitration Committee. CBOT is one of four designated contract markets (exchanges regulated by the Commodity Futures Trading Commission under the Commodity Exchange Act) within CME Group Inc.

by Allston "across multiple different Treasury instruments and in multiple markets all at once." [1] ¶ 25. More specifically, the original complaint alleged that Allston spoofed the cash Treasury markets on the electronic trading platforms BrokerTec and eSpeed in violation of the securities laws. [1] ¶¶ 45–50. The original complaint also alleged, as a factual matter, that Allston spoofed the Treasury futures markets on exchanges operated by CBOT. [1] ¶ 25. Moreover, the original complaint alleged that the cash Treasury and futures markets are highly correlated, [1] ¶ 38, and that Allston's spoofing of the cash Treasury and futures markets was part of a coordinated scheme, [1] ¶¶ 4, 36, citing example transactions in both markets that occurred within less than 27 milliseconds of a particular time, [1] ¶ 35. The original complaint states that "Allston's spoofing caused millions of dollars in trading losses for Chopper." [1] ¶ 43.[2] Nevertheless, in a footnote, Chopper disclaimed that it sought any damages in court for the futures claims, stated that it had, simultaneously to filing the complaint in court, initiated an arbitration against Allston for the futures claims, and noted that the complaint in court asserted claims for separate damages for securities fraud in the BrokerTec and eSpeed cash Treasury exchanges. [1] ¶ 9 n.1. The original complaint asserted a securities law count: Count I, based on § 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5. [1] ¶¶ 45–50. (The original complaint also alleged (in Count II) a claim under the Illinois Consumer Fraud Act (ICFA), 815 ILCS 505/1, *et seq.* [1] ¶¶ 51–61.)

On May 10, 2019, Allston filed a motion to compel arbitration, [18], and a motion to dismiss for failure to state a claim, [22]. The court set a briefing schedule on those motions, directing the parties to complete briefing by June 7, 2019. [26].

Chopper did not file a response to Allston's motions. Instead, on May 31, 2019, Chopper filed a first amended complaint—the operative complaint. [27]. In light of the first amended complaint, the court later denied Allston's motions as moot. [55]. The court now turns to the amended complaint.

Chopper's amended complaint continues to allege spoofing by Allston, but attempts to limit the factual allegations to the cash Treasury market and not the futures market. The amended complaint alleges spoofing in transactions in the cash Treasury market on BrokerTec and eSpeed; it excises references to the futures market, futures transactions, and CBOT exchanges. For example:

- Chopper's original complaint alleged improper trading activity by Allston "across multiple different Treasury instruments and in multiple markets all at once." [1] ¶ 25. In contrast, the amended complaint alleges that the

---

[2] The original complaint also attached as an exhibit a spreadsheet "identifying the instances and details surrounding Allston's spoofing." [1] ¶ 39; [4] (sealed). According to the original complaint, the spreadsheet "estimates the total loss suffered by Chopper as a result of Allston's spoofing." [1] ¶ 39.

3

> improper trading activity was "across multiple different *cash* Treasury instruments all at once." [27] ¶ 25 (emphasis added).

- The original complaint alleged specific near-simultaneous transactions in both the cash and the futures markets. [1] ¶ 35; *see also* [4] (original Exhibit 1) (spreadsheet identifying instances and details surrounding Allston's alleged spoofing) (sealed). In contrast, the amended complaint alleges specific near-simultaneous transactions in the cash market only. [27] ¶ 35; *see also* [28] (amended Exhibit 1) (sealed).

Like the original complaint, the amended complaint asserts a securities law claim: Count I, based on § 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5. [27] ¶¶ 43–48. (The amended complaint also alleges (in Count II) a claim under the ICFA, 815 ILCS 505/1, *et seq*. [27] ¶¶ 49–59.)

On June 14, 2019, Allston filed another motion to compel arbitration, [32], and a motion to dismiss the amended complaint for failure to state a claim, [41]. The court set a briefing schedule on those motions, directing the parties to complete briefing by July 26, 2019. [44]. After briefing was complete, the case was reassigned to this judge. [54].

Partly at the court's request, the parties have filed under seal information relating to the arbitration. *E.g.*, [60] (sealed); [74] & exhibits (sealed); [83] & exhibit (sealed); [89] (sealed). The court has considered this information as necessary.

## DISCUSSION

Allston has filed motions to compel arbitration, [32], dismiss the amended complaint, [41], and supplement the record, [74] (sealed), [75].

The court turns first to the motion to compel.

Allston moves to compel Chopper to arbitrate the claims in Chopper's amended complaint under the mandatory arbitration procedures that govern disputes between members of CBOT. [32].

The Federal Arbitration Act (FAA) governs whether the court must compel arbitration. The FAA provides, as relevant:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

4

9 U.S.C. § 2. The FAA "mandates enforcement of valid, written arbitration agreements," *Tinder*, 305 F.3d at 733, and "embodies both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract," *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (citation and internal quotation marks omitted). "[B]ecause arbitration is a matter of contract, a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Gore*, 666 F.3d at 1032 (citation and internal quotation marks omitted). Thus, the court must compel arbitration if it finds that: "(1) there is an enforceable written agreement to arbitrate; (2) the dispute falls within the scope of the arbitration agreement; and (3) a party refuses to arbitrate." *Smith v. Cavalry Portfolio Services LLC*, No. 20-cv-1375, 2020 WL 7682236, at *1 (N.D. Ill. Dec. 26, 2020) (citing 9 U.S.C. § 4; *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005)). "Courts evaluate agreements to arbitrate under the same standards as any other contract, . . . which include all general principles of state law." *Allscripts Healthcare, LLC v. Etransmedia Tech., Inc.*, 188 F. Supp. 3d 696, 700 (N.D. Ill. 2016) (citations and internal quotation marks omitted). "[T]he FAA provides for stays of litigation when an issue presented in the case is referable to arbitration." *Tinder*, 305 F.3d at 733 (citing 9 U.S.C. § 3).

Allston's motion to compel arbitration involves two of the three disputes mentioned above: (1) the question of arbitrability, meaning whether Chopper's claims in this case (spoofing claims regarding the cash Treasury market) fall within the scope of the CBOT arbitration agreement, or put another way, whether the parties agreed to arbitrate the claims Chopper has filed in court (if so, those claims belong in CBOT arbitration along with the spoofing claims regarding Treasury futures); (2) the antecedent question of who—court or arbitrator—has the authority to decide the first question.

The court begins with the second question: who decides arbitrability? "As a general rule, courts and not arbitrators decide the question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the question of arbitrability." *Allscripts*, 188 F. Supp. 3d at 700 (citations, internal quotation marks, and brackets omitted). "But that is just a presumption." *Id.* at 701. Under the FAA and Supreme Court precedent, "the question of who decides arbitrability is itself a question of contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019). The parties can agree to arbitrate threshold arbitrability questions "so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Id.* at 530 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

Although the question of who decides arbitrability is one of contract, a heightened standard—"clear and unmistakable" evidence—applies to whether the parties agreed to arbitrate arbitrability. *See First Options*, 514 U.S. at 944; *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010). Comparing the question of

5

who should decide arbitrability to the question of arbitrability itself (*i.e.*, the scope of the arbitration agreement), *First Options* explained:

> The latter question arises when the parties have a contract that provides for arbitration of some issues. In such circumstances, the parties likely gave at least some thought to the scope of arbitration. And, given the law's permissive policies in respect to arbitration, one can understand why the law would insist upon clarity before concluding the parties did *not* want to arbitrate a related matter. On the other hand, the former question—the "who (primarily) should decide arbitrability" question—is rather arcane. A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers. And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the "who should decide arbitrability" point as giving the arbitrators the power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.

*First Options*, 514 U.S. at 945 (internal citations omitted) (emphasis in original).

Given these principles, any doubts about who decides arbitrability are resolved in favor of the courts. *Id.* at 944–45. Nevertheless, "if a valid [arbitration] agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein*, 139 S. Ct. at 530.

Allston argues that Chopper contractually agreed to have CBOT arbitrators resolve any questions about the arbitrability of disputes between CBOT members. [35] at 8. Allston points to a CBOT rule—CBOT Rule 606—as clear and unmistakable evidence of an agreement to delegate questions of arbitrability to CBOT.

Before analyzing that rule, for context:

As members of CBOT during the relevant times, Chopper and Allston were bound by the CBOT Rules. The CBOT Rules include a chapter (Chapter 6) on arbitration.

A rule in Chapter 6, Rule 600.A(1), governs the question of arbitrability, that is, the question whether Chopper's claims in this case (the claims about spoofing in the cash Treasury market) fall within the scope of the CBOT arbitration agreement.

6

Rule 600.A(1) provides:

It is contrary to the objectives and policy of the Exchange for members to litigate certain Exchange-related disputes. Disputes between and among members that are described below and that are based upon facts and circumstances that occurred at a time when the parties were members shall be subject to mandatory arbitration in accordance with the rules of this Chapter:

1. claims between members that relate to or arise out of any transaction on or subject to the rules of the Exchange; . . . .

[37-1] at 23.

With that context, returning to the question of who should decide arbitrability, the court or the arbitrator:

Allston contends that another rule in Chapter 6, Rule 606, is clear and unmistakable evidence of an agreement to delegate questions of arbitrability to CBOT.

Rule 606 provides:

Any party may file a challenge to the arbitrability of a dispute submitted for arbitration at the Exchange. A party's failure to file a timely challenge to arbitrability shall waive any right to object thereafter to the arbitrability of the dispute.

A challenge to arbitrability by a claimant must be filed no later than 5 days after the claim is submitted for arbitration. A challenge to arbitrability by a respondent must be filed no later than 10 days after the respondent has received notice of the claim. The request must be in writing and state the reasons why the dispute is not arbitrable at the Exchange. Any other party may file a written response in support of or opposition to the challenge no later than 10 days after receiving notice of the challenge to arbitrability.

The chairman may decide the arbitrability of a dispute based on his consideration of the written submissions of the parties. The chairman's decision shall be final and is not appealable.

[37-1] at 25–26. Allston argues that Rule 606 "unmistakably requires ***both*** claimants and respondents to promptly submit any question as to arbitrability to CBOT." [35] at 9 (emphasis in original). Allston goes on to say that Rule 606 does not provide an exception "allowing claimants like Chopper to seek a judicial determination of arbitrability." [35] at 9.

7

The court agrees with Allston that Rule 606 provides clear and unmistakable evidence that the parties agreed to arbitrate questions of arbitrability.

Rule 606 expressly empowers an arbitrator (the chair of the arbitration panel) to decide the question of arbitrability: "The chairman may decide the arbitrability of a dispute based on his consideration of the written submissions of the parties. The chairman's decision shall be final and is not appealable." [37-1] at 26. Thus, the parties considered whether the arbitrators should have the authority to decide arbitrability, assigned that authority to the chair, and made the chair's decision final and unappealable. The parties clearly considered the significance of having the arbitrator decide arbitrability and decide it with finality.

Moreover, in outlining procedures for challenging the arbitrability of a dispute, Rule 606 states that "[a] party's failure to file a timely challenge to arbitrability shall waive any right to object thereafter to the arbitrability of the dispute." [37-1] at 25–26. This language shows that the parties considered the significance of a party's failing to follow the procedures set by the rule for filing challenges to arbitrability (that is, waiver of the right to object to arbitrability).

For these reasons, the language of Rule 606 shows that the parties both considered whether the arbitrator should have the authority to decide arbitrability and granted that authority to the arbitrator, satisfying the clear statement requirement and the reasons for that requirement. *See First Options*, 514 U.S. at 945.

Chopper makes three arguments in response to Allston's assertion that the parties agreed to arbitrate the question of arbitrability: (1) Rule 606 cannot represent the clear and unmistakable intent of the parties because the Rules "were written exclusively by CBOT, and Allston and Chopper only entered into them as a condition of CBOT membership"; (2) the plain language of Rule 606 is permissive rather than mandatory, "and thus cannot *require* arbitrability to be determined by CBOT"; and (3) Rule 606 by its terms applies only to claims "submitted for arbitration at the Exchange" and the claims in this case (claims about the cash Treasury market) were not submitted for arbitration at CBOT. [45] at 12–13 (emphasis in original).

As to Chopper's first argument, Chopper does not dispute that the CBOT Rules, as a matter of contract law, are valid and binding on both Chopper and Allston. Instead, Chopper argues that "[i]t is illogical, and certainly not 'clear and unmistakable' to argue that [ ] CBOT, in writing its own rules, intended to appoint itself as the gatekeeper of disputes occurring on non-CBOT platforms." [45] at 12. Thus, Chopper argues that CBOT cannot possibly have written rules that would allow CBOT to arbitrate a dispute involving non-CBOT platforms. But first, "arbitration is a matter of contract" and "parties can agree to arbitrate gateway questions of arbitrability." *Rent-A-Center*, 561 U.S. at 68–69 (citations and internal

8

quotation marks omitted). Chopper and Allston were free to, and did, agree to abide by the CBOT Rules as a condition of CBOT membership. That CBOT authored those rules does not change the analysis. And second, it is not at all illogical or implausible that CBOT would have thought a CBOT arbitrator well positioned to decide whether a particular claim was a "claim[ ] between members that relate[s] to or arise[s] out of any transaction on or subject to the rules of the Exchange." Rule 600.A(1).

Chopper's second argument is also unpersuasive. Chopper argues that Rule 606's use of the word "may" suggests that the parties' agreement was to "merely ***permit*** arbitrability to be decided by CBOT arbitrators . . . and not to ***require*** that arbitrability be decided solely by a CBOT arbitrator." [45] at 13 (emphases in original). Of course, "may" is permissive and "shall" is mandatory. But the answer to the question here does not turn on that distinction. The question here is whether the parties clearly and unmistakably conferred on the arbitrator the authority to decide arbitrability. "May" clearly and unmistakably grants the arbitrator that authority. *Cf. Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 122 (2d Cir. 2003) (finding clear and unmistakable evidence in the following language: "[I]f any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, [the arbitrator] may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima* facie satisfied that an arbitration agreement under the Rules may exist"). "May" confers authority on the arbitrator; "shall have the power" is more emphatic, but both grant authority. *See Allscripts*, 188 F. Supp. 3d at 701–02 (finding clear and unmistakable evidence in the following language: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim").

Chopper's third argument is that Chopper's claims as to cash Treasury markets have not been submitted for arbitration at CBOT and therefore fall outside Rule 606. Chopper points to the first sentence of the rule: "Any party may file a challenge to the arbitrability of a dispute *submitted for arbitration at the Exchange*." [37-1] at 25 (emphasis added). Chopper argues that the rest of Rule 606, including the authorization of the chair to decide arbitrability, hinges on this language.

The parties have not fully briefed the question whether the claims in this case were in fact submitted for arbitration at the Exchange. But it is not necessary to reach that issue to address Chopper's argument. Chopper argues that because Chopper did not submit the claims in this lawsuit for arbitration at the Exchange, Rule 606 does not clearly and unmistakably grant the arbitrator the authority to resolve the arbitrability of the claims in this lawsuit. In other words, Chopper interprets "submitted for arbitration at the Exchange" as a substantive limit on the group of disputes for which the parties agreed to arbitrate arbitrability (or at least a

9

procedural prerequisite to the arbitration of arbitrability). But in the context of the entire Rule 606 itself and the CBOT Rules more generally, the better reading is that "submitted for arbitration at the Exchange" does not substantively limit the set of disputes for which the parties agreed to arbitrate arbitrability, for the following reasons.

First, the last two sentences of Rule 606 broadly grant the arbitrator the power to finally decide, without the possibility of appeal, the arbitrability of "*a* dispute," not a dispute "submitted for arbitration at the Exchange." Second, Rule 606 provides for challenges to arbitrability by claimants ("[a] challenge to arbitrability by a claimant must be filed no later than 5 days after the claim is submitted for arbitration"); if a claimant could control which disputes would be subject to review for arbitrability by deciding which disputes to "submit[ ] for arbitration at the Exchange," it is unclear why Rule 606 would allow challenges to arbitrability by claimants. Third, elsewhere the Rules presume that persons affiliated with the Exchange, including staff and arbitrators, have the power to decide arbitrability (without mentioning the court). *See* Rule 432.R, [37-1] at 18-19 ("It shall be an offense: . . . (R. to fail to submit to arbitration any dispute *which Exchange staff, an arbitration panel or the Board decides should be arbitrated* pursuant to Chapter 6; or to fail to comply with a final arbitration award; . . . .") (emphasis added).

In that context, "submitted for arbitration at the Exchange" does not circumscribe the category of disputes for which the arbitrator has been granted authority to decide arbitrability, as Chopper contends. Rather, that language simply describes the process by which the question of arbitrability arrives before the arbitrator, including scenarios where the court compels arbitration (as here), the dispute is then submitted for arbitration at the Exchange, and the claimant may then file a challenge to arbitrability if it chooses.

In sum, because there is clear and unmistakable evidence of the parties' agreement to arbitrate arbitrability, the court may not reach the question of arbitrability—that is, whether the claims in this case fall within the scope of the arbitration agreement and thus are arbitrable. *See Henry Schein*, 139 S. Ct. at 530. That is a question for the arbitrator. As such, the motion to compel is granted. The case is stayed pending resolution of the arbitration. If the arbitrator decides that Chopper's claims are not arbitrable and Allston seeks to reopen this case, the court will do so.

Since the motion to compel arbitration has been granted, the motion to dismiss is denied without prejudice, with leave to refile should the arbitrator decide that Chopper's claims are not arbitrable.

After Allston's motion to compel and motion to dismiss were fully briefed, Allston filed a motion to supplement the record. [74] (sealed), [75]. The motion to

10

supplement is granted. To the extent the court found the supplemental information relevant to the motion to compel, the court considered the information.

## CONCLUSION

Allston's motion to compel arbitration and motion to supplement the record are granted. The arbitrability of Chopper's claims is itself a question for arbitration. This case is stayed pending resolution of the arbitration. If the arbitrator decides that Chopper's claims are not arbitrable and Allston seeks to reopen this case, the court will do so. Allston's motion to dismiss is denied without prejudice, with leave to refile should the arbitrator decide that Chopper's claims are not arbitrable.

Dated: August 20, 2021              /s/ Martha M. Pacold